## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,    :
STATE OF DELAWARE, DISTRICT OF   :
COLUMBIA, STATE OF FLORIDA,    :
STATE OF HAWAII, STATE OF     :
ILLINOIS, COMMONWEALTH OF    :
MASSACHUSETTS, STATE OF      :
NEVADA, STATE OF TENNESSEE,   :
STATE OF TEXAS,         :
COMMONWEALTH OF VIRGINIA,   :
STATE OF GEORGIA, STATE OF    :
INDIANA, STATE OF MICHIGAN,   :
STATE OF MONTANA, STATE OF   :
NEW HAMPSHIRE, STATE OF NEW  :
MEXICO, STATE OF NEW YORK,   :
STATE OF CALIFORNIA, STATE OF  :
NEW JERSEY,  STATE OF      :
OKLAHOMA, STATE OF RHODE   :
ISLAND, STATE OF WISCONSIN, EX  :
REL. ROBERT RUDOLPH, HECTOR  :
ROSADO, ROBERT EVAN DAYWITT,  :
BRADLEY LUTZ, JAMES WETTA and  :
WILLIAM LOFING        :
       Plaintiffs,      :
               :
    v.           :
               :
ELI LILLY & COMPANY     :
Lilly Corporate Center      :
Indianapolis, Indiana,      :
       Defendant.

CIVIL ACTION NO. 03-943

*FILED IN CAMERA
AND UNDER SEAL*

*JURY TRIAL DEMANDED*



FILED

AUG 1 4 2008

MICHAEL E. KUNZ. Clerk
By_____ Dep Clerk

## THIRD AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE *QUI TAM* PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND SIMILAR STATE PROVISIONS

## I.   JURISDICTION AND VENUE

1.    This is an action to recover damages and civil penalties on behalf of the United States of America, several individual states arising from Defendant Eli Lilly & Company's ("Eli Lilly") conduct in conspiring to cause false claims to be presented under the Federal Medicare, Medicaid, and CHAMPUS Programs.

2.    Medicare is a federally funded health insurance program primarily for the elderly. Medicaid is a state and federal assistance program to provide payment of medical expenses for low income patients. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is a program of medical insurance benefits provided by the federal government to individuals with family affiliations to the military services.

3.    These *qui tam* claims arise under the provisions of the False Claims Act, 31 U.S.C. § 3729, et. seq. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 & 3730.

4.    Personal Jurisdiction and venue for this action are predicated on 31 U.S.C. § 3732(a) which provides that "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants any one defendant, can be found, resides, transacts business or in which any act proscribed by § 3729 occurred". Defendant Eli Lilly transacts substantial business in the Eastern District of Pennsylvania.

5.     This Court also has supplemental jurisdiction over the California, Delaware, District of Columbia, Florida, Hawaii, Illinois, Massachusetts, Nevada, Tennessee, Texas, Virginia, Georgia, Indiana, Michigan, Montana, New Hampshire, New Mexico, New York, New Jersey, Oklahoma, Rhode Island and Wissconsin *qui tam* claims pursuant to 28 U.S.C. § 1367 which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

6.     Under the False Claims Act, this Complaint is to be filed *in camera* and remain under seal for a period of at least 60 days and shall not be served on the defendant until the Court so orders.  The government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information.

## II.    **PARTIES**

7.     *Qui tam* Plaintiffs Robert Rudolph, Hector Rosado William Lofing and Robert Evan Daywitt are citizens and residents of the state of Oregon.  *Qui tam* Plaintiff Bradley Lutz is a resident of the state of Idaho, *Qui tam* Plaintiff James Wetta is a citizen and resident of the state of California (collectively the "Relators").  The Relators bring this action on behalf of the United States of America.

8.     Relators are former employees of Eli Lilly.  Relators have personal knowledge of Eli Lilly's conduct and its conspiracy with doctors and pharmacies as set forth herein. Each of the Plaintiff Relators also assert claims for retaliatory discharge pursuant to 31 U.S.C. §3770 (h).

3

9.      As required under the False Claims Act, Relators have provided to the Attorney

General of the United States and the United States Attorney for the Eastern District of

Pennsylvania simultaneously with the filing of this Complaint, a statement of all material

evidence and information related to the Complaint.  This disclosure statement supports the

existence of false claims by Eli Lily and possibly others, in the Medicare, Medicaid and

CHAMPUS Programs.

10.     Defendant Eli Lilly is a corporation incorporated under the laws of Indiana, with

its principal place of business in Indianapolis, Indiana.

## III.   FACTUAL ALLEGATIONS

### A.     The Sales Program – Prozac Weekly, Zyprexa, Evista, Humulin

11.     Since sometime in 2001, Eli Lilly ("Lilly") has embarked on various national

sales programs whose purpose is to convert patients from the use of medications not

manufactured by Eli Lilly to similar competing drugs manufactured and distributed by Eli

Lilly, or, in the alternative, to convert patients from drugs whose patent was about to expire

or recently expired to more extensive patent protected drugs.

12.     Doctors have been lured and enticed to conspire with Eli Lilly through programs

utilizing incentives of free samples, free trips, and the encouragement to bill for office

visits which might otherwise never take place.  The unnecessary office visits are necessary

to justify the change in prescriptions to various Lilly drugs, particularly Prozac Weekly,

Evista, Humulin, and Zyprexa.

13.     The Lilly drugs which have been promoted in various improper programs include,

but are not limited to Prozac Weekly, Zyprexa, Evista and Humulin.

4

14.     Patients transitioning to each of the drugs, Prozac Weekly, Zyprexa, Evista and Humulin from other medications should do so only under a physician's personal direction. Each patient's individual dosage should be monitored by the patient's treating physician. Each of the drugs can cause dangerous side effects if not administered properly by a physician familiar with the details of their use and the patient's individual needs.

**B.     Prozac Weekly**

15.     Sometime in 2001, Lilly initiated a sales program intended to conspire with doctors and pharmacies to convert patients from its drug, Prozac, whose patent was about to expire, to the more expensive patent protected drug, Prozac Weekly.

16.     The package insert for Prozac Weekly specifically states that the drug's efficacy must follow 13 weeks of open-label treatment with Prozac 20 mg. once daily. On information and belief, this initiation period was not considered in the transitioning of patients to Prozac Weekly. (A copy of the Prozac Weekly insert is attached hereto as Exhibit "A").

17.     As part of its marketing program, Lilly representatives supply conversion packets to assist patients transitioning from other Selective Serotonin Reuptake Inhibitors (SSRI).

18.     As part of its marketing programs, Lilly sales representatives were instructed to obtain patient names from physician offices. The Relators became aware of Lilly sales representatives going into physician offices on Saturdays to obtain the names of patients who were suffering from diabetes or depression. Physicians were then prompted to write prescriptions for Lilly products in the names of those patients. In return, the physicians were given performance scripts and coupons for the drugs. (Performance scripts are Lilly coupons which are used to reimburse pharmacies for the sale of Lilly products). In some cases, prescriptions were actually faxed from the physician offices to the pharmacies to be filled. Doctors signed prescriptions for healthy medical staff in order to obtain additional samples.

5

19.     The physicians or members of their office staffs supplied patient names, birth dates and social security numbers to the Lilly sales representatives.  Once the prescriptions were filled by a cooperating pharmacy, they were delivered back to the doctor's office.  In extreme cases where the "prescribed Lilly drug" was not given to the patient originally identified on the prescription, the doctor was instructed to simply black out the name of that patient and provide either Prozac Weekly or Humulin to another patient.

20.     Lilly sales representatives were instructed to use their "performance scripts" to pay the pharmacy for these prescriptions.

21.     In some regions, Lilly sales representatives employed a form letter instructing compliant physicians as to how to generate a list of their patients from pharmacies which filled their prescriptions.

22.     As a result of these practices, Lilly counted the bartering of its drugs as sales for purposes of charting representatives' performance and bonuses.  In order to provide an inflation of sales figures, many of the sales representatives would "double prescribe" for patients by using the worldwide web site WEBMD.  Sales figures would include the original prescription for the patient obtained by the patient's treating physician in addition to the second prescription obtained from WEBMD on behalf of the same patient.  Patients were also encouraged to visit the website and input the necessary information and obtain a prescription on their own.

23.     Eli Lilly sales representatives routinely share successful marketing tactics among themselves over the company Knowledge Management intranet site under the title "Best Practice Descriptions".  Attached hereto as Exhibit "B" is a description of how private patient information from a nursing home was improperly used to obtain the transition of 40 Prozac Daily patients to weekly.  The same memo boasts of one physician who had switched over 100 patients to Prozac Weekly and was willing to do even more.

24.     On information and belief, many of the conversions described as "Best Practice" occurred without the knowledge of the nursing home patient.

6

25.    On information and belief, these conversions took place without an appropriate stabilizing weaning period from Prozac Daily to Prozac Weekly.

26.    The attached Best Practice Description first posted on August 1, 2002 continues to be displayed on the Knowledge Management web site.

27.    The attached Best Practice Description is aimed at eight national sales marketing divisions within Eli Lilly. Each of these divisions contains approximately 500 Lilly sales representatives whose sales territories encompass the entire United States: Alpha Division – includes sales people selling Lilly drugs, Evista, Serafam and Prozac Weekly; Delta includes sales people marketing to primary care physicians the Lilly drugs, Stratera used for Attention Deficit Hyperactivity disorder and Zyprexa; Diabetes is made up of the Lilly sales people who market Humulin to primary care physicians and endocrinologists; Gamma includes sales people who market Evista, Prozac Weekly and Serafam to primary care physicians; Neuro Institutional group markets Zyprexa to Veterans' Administration Hospitals and nursing homes; Neuro LTC is the long term care group. It markets Zyprexa and Prozac Weekly to long term care facilities; Sigma markets Zyprexa and Stratera to primary care physicians and psychiatric nurse practitioners.

28.    As part of the program, Eli Lilly representatives conspired with pharmacies to obtain lists of customers using drugs manufactured by Eli Lilly's competitors which were similar to Eli Lilly manufactured drugs. The compliant pharmacies were rewarded with Eli Lilly coupons which could be redeemed for prescriptions and the receipt of prescriptions from physicians that had been attracted to the "program" by the Lilly sales representatives. Each pharmacy received an additional $3.00-$4.00 dispensing fee as an incentive for its cooperation with Lilly programs.

29.    Once the pharmacy list was obtained, Eli Lilly representatives contacted the prescribing physicians and attempted to convince those physicians through the use of free samples to switch patients from the competitors' medication to the appropriate Eli Lilly drug.

7

30.     Eli Lilly's sales representatives were instructed to encourage physicians to bill for a patient visit to justify the change of prescription, even where no patient visit occurred. The physicians were also encouraged to bill Medicaid for a drug dispensing fee in those states in which the Medicaid Program provided for such reimbursement.

31.     Upon information and belief, the physicians would bill for a patient's office visit although none took place in order to justify the change in prescription. For patients in the Medicare, Medicaid and CHAMPUS programs such false claims were submitted to either the federal government or the respective state Medicaid Program.

32.     Patients would then be provided with Eli Lilly new drug "samples" without being told that a prescription was previously written and filled in their name.

33.     In one specific instance in Modesto, California, 34 patients of a single physician were converted to Prozac Weekly.

34.     Eli Lilly memos have referred to this program as the "Modesto Prozac Weekly Conversion Program" and stated that the program had generated more prescriptions in a single day than had been generated in any single month in the Modesto territory.

35.     The Relators raised concerns of the legality and professional ethics of this Conversion Program to an Eli Lilly Corporate Compliance Officer.

36.     The Compliance Officer was specifically advised that the aforementioned sales practices violated Lilly's "Red Book" of good promotional practices. The same Compliance Officer called one of the Relators back and acknowledged that based upon his review of these sales practices, there were violations of at least 19 of the good promotional practice guidelines. Although the Compliance Officer initially expressed concern with the program, the compliance officer later reported to the Relators that the practices about which they were complaining were "perfectly legal".

8

37.     The same Corporate Compliance Officer acknowledged that the performance script numbers in those geographic regions where the practice was followed greatly outperformed other geographic regions. Immediately following the report of these illegal practices to the Corporate Compliance Officer, there was a short period where the "sales program" seemed to stall. After a short hiatus, however, the practice resumed.

38.     The sales representatives responsible for the promotion of the aforementioned sales practice were first placed on probation and then later promoted. One sales representative that had been placed on probation was later promoted to a headquarters' position in Indianapolis.

39.     In January, 2002, the aforementioned sales practices were discussed at a far west regional sales meeting. One sales representative complained that sales were artificially inflated because of performance scripts and coupons paid for by Lilly and not patient or insurer. The employee who raised the issue was later singled out for reprimand and was forced to resign from the company.

40.     Sometime following the January 2002 sales meeting, a voice mail was circulated among various Lilly sales representatives instructing them to find doctors who would "cooperate" so that they could find patient names, social security numbers and other relevant information to allow for prescriptions of Prozac Weekly.

41.     The sales promotional practices set forth in this Complaint have been described as a "Win, Win, Win situation" - "cooperating" doctors were able to bill for non-essential office visits, pharmacies were able to receive compensation for filling of prescriptions, and patients initially received free product.

42.     All five (5) of the Relators responsible for this Complaint have either sought relief through medical leave, resigned or have retired due to pressures brought against them by Eli Lilly management as a result of complaints made about the aforementioned sales practices.

43.     During the same time period from 2001 until the present, Lilly has also embarked on a concerted effort to promote the off-label use of its drugs, particularly Zyprexa and Evista. Off-label use refers to usage not tested nor approved by the Food and Drug Administration ("FDA").

C.     **Zyprexa**

44.     On information and belief, much of the sales volume for the drug, Zyprexa, is generated by primary care physicians not familiar with the drug's drawbacks and side effects.

45.     The FDA approved use of Zyprexa in the treatment of bipolar one and schizophrenia, mental illnesses, traditionally assigned almost exclusively to psychiatrists.

46.     Zyprexa faces difficult competition from significantly less expensive alternative drugs.

47.     The use of Zyprexa is associated with extreme weight gain resulting in cases of Type II diabetes.

48.     Instead of limiting its sales promotions to the FDA approved indications for Zyprexa, Lilly vigorously pursued off-label usage of Zyprexa among general or primary care practitioners. Lilly sponsored speakers and audio conferences "pushed" the use of Zyprexa among general practitioners for the treatment of the elderly for dementia and refractory depression. On information and belief, many of the general practitioners in the Lily audience are unfamiliar with Zyprexa's side effects.

49.     Lilly has aggressively promoted the off-label use of Zyprexa by measuring the performance of its sales people based on the number of off-label speakers and audio conferences each sets up.

50.     The off-label lectures are punctuated by "planted questions" put by Lilly sales people posing as interested persons in the audience. Certain physician speakers who were found to be particularly effective were imposed on sales territories. Conversely, speakers who refused to promote off-label use were not invited back.

10

51.   Sometime during the year 2000, Lilly management made the decision to increase off-label sales of Zyprexa by promoting the drug's use in the treatment of symptoms associated with severe mental disorders as opposed to the narrow set of indications for which the drug had been approved by the FDA.

52.   Between July 1 and December 31, 2001, Zyprexa's off-label use was increased through the use of what was known as the "Shelton reprint", entitled "A Novel Augmentation Strategy for Treating Resistant Major Depression". The "Shelton Reprint" referred to an article authored by Dr. Richard Shelton and others that appeared in the January 2001 issue of the American Journal of Psychiatry.

53.   A synopsis and sales guideline of the "Shelton Reprint" was made available to Lilly's Sigma sales group. The guidelines warn that promotion based on the reprint is "inappropriate". It also states "The reprint allows us to do two things:  highlight Zyprexa as a **broad spectrum** antipsychotic, and continue to establish Zyprexa's **relevance** in **primary care**." (emphasis in original) (Copy attached as Exhibit "C").

54.   Notably, Lilly sales brochure, "Treatment of Behavioral Disturbances in the Older Adult", describes the use of olanzapene (Zyprexa) for only "behavioral disturbances associated with Alzheimer's disease dementia". (At p. 9) (Copy attached as Exhibit "D").

55.   One of the adverse side effects particularly associated with the use of Zyprexa is excessive weight gain.

56.   Lilly management became aware of this side effect and attempted to minimize the dangers associated with the weight gain, as well as the causal relationship between the weight gain and the use of Zyprexa.

57.   Minimization of the weight gain risks was accomplished with the use of such tactics as promotional materials and videotape discussing, "The Myth of Diabetes", allegedly scientific studies of questionable integrity as well as the haphazard reporting of adverse events, both internally at Lilly and subsequently to the FDA.

11

58.     In recognition of the misleading statements contained in its sales literature, Lilly management decided in the summer of 2003 to order the destruction of all then existing Zyprexa specific core sales aids, flip charts and acetates in the possession of its sales representatives. (See attached Exhibit "E").

59.     Eli Lilly also manufactures Zyprexa in a sublingual form called Zydis. Because Zydis is a tablet that dissolves under the tongue, it is claimed to be particularly effective in treating elderly patients, sometimes referred to as "cheekers" and "spitters", who resist taking the pill form of the drug.

60.     In an effort to minimize the risk of diabetes onset associated with Zyprexa, Eli Lilly's sales representatives promote Zydis as not having the same side effects or weight gains caused by Zyprexa.

61.     Eli Lilly's sales representatives are instructed to advise doctors that because Zydis is not swallowed, it travels a digestive path different from Zyprexa, bypassing the stomach, lessening interaction time with serotonin (5HT-2) receptors in the stomach.

62.     The basis for these misrepresentations has been shown to be false by various independent authorities who note that weight gain results from stimulation of the brain and not the stomach.

63.     Lilly's own promotional materials state that Zyprexa's effectiveness is not affected by the body's absorption of food.

**D.     EVISTA**

64.     EVISTA is approved by the Federal Drug Administration for sale only for the prevention and treatment of osteoporosis in post-menopausal women. Nevertheless, EVISTA was improperly and aggressively marketed by Eli Lilly to treat and prevent diseases other than osteoporosis in post-menopausal women.

65.     When properly prescribed to patients suffering from osteoporosis, EVISTA is generally taken for the remainder of the lifetime of the patient.

12

66.     Dating back to 2001, Lilly's sales force was directed by management to improperly market EVISTA through the use of free heel scans combined with the use of "free coupons" for EVISTA. The heel scans, which measure bone density of the foot, were used to improperly increase sales of EVISTA due to their tendency to generate "false" positives for osteoporosis.

67.     The free heel scans were used in place of far more accurate bone-mineral density measurements of the lumbar spine.

68.     Nevertheless, Lilly embarked on a nationwide program whereby its sales representatives advised physicians that the company would provide free use of heel scans in the physicians' offices "to screen post-menopausal women for osteoporosis" and combined those free heel scans with "free coupon", first time prescriptions for EVISTA.

69.     The doctors' offices were serviced by several heel scan vendors, that through Lilly also provided a nurse/operator free of charge for the days that the heel scans were placed in the physicians' offices.

70.     The sales representatives were instructed to, and did, urge use of the free heel scan service on all the doctors' women patients past the age of forty-five, regardless of the presence or absence of other risk factors for the disease. No effort was made to limit use of the heel scan to patients who actually possessed the risk factors associated with osteoporosis or exhibiting signs or symptoms of the disease.

71.     The sales representatives were instructed to tell the doctors that the heel scans would be reimbursed by Medicare or insurance carriers. The sales representatives were instructed to provide the necessary Medicare CPT billing codes. Even where negative, heel scans are Medicare-reimbursable under the Medicare Bone Mass Measurement Coverage Standardization Act (effective July 1, 1998).

13

72.    In return for providing the nurse/operator and machine free of charge, for which the physician could bill for both the heel scan and the patient's office visit, the physician was asked to provide the Lilly sales representative with a list of all female patients aged forty-five or older so that they could be invited into the physician's office and receive heel scans.

73.    Lilly selected physicians for this national program, by sales district, based on the size of the doctor's practice.

74.    Physicians who enthusiastically participated in the program were also often invited to participate in "Advisory Board" programs which took place at various resort locations. In addition to flying physicians and family members to the meeting, the doctors received stipends of between $750.00 and $1,000 or more, for attending the meeting.

75.    Lilly sales representatives offered the physicians coupon books that allowed for a 30-day free supply of EVISTA. Using the provided list of female patients, Lilly's sales representatives filled prospective 30-day EVISTA prescriptions for patients, prior to the heel scans, and without the patient's knowledge or consent.

76.    Patients were selected for heel scans in two ways: 1) sign up sheet in the doctors' offices; and 2) the selection of patients forty-five years or older. A postcard supplied by Lilly was sent to the patients announcing the free heel scan.

77.    Lilly provided no information to the doctors or its sales representatives describing the severe diagnostic limitations of the heel scans. The heel scans alone simply do not provide an adequate basis for a diagnosis of osteoporosis.

78.    Accordingly, Lilly engaged in a scheme, offering free use of heel scans for physicians, for which the physicians could and did charge for an office visit; charged for a heel scan; filled EVISTA prescriptions in advance (using free coupons for EVISTA) without those patients' knowledge or permission; and intentionally used a diagnostic technique (heel scan) that lead to a significant percentage of lifetime EVISTA prescriptions for patients for whom the drug was medically unnecessary.

14

79.     EVISTA is not without dangerous side effects. Filling unwarranted first-time EVISTA prescriptions, and thereafter maintaining those prescriptions, needlessly exposed patients to heightened risks of blood clotting in their veins, venous thrombosis events.

80.     In addition to promoting EVISTA through the use of questionable bone scans combined with free EVISTA, Lilly sales representatives were improperly instructed to tell physicians, and did tell physicians, that the drug might prevent breast cancer.

81.     Lilly sales representatives were also improperly instructed to tell interested physicians, and did tell physicians, that EVISTA might be effective in the reduction of risk of cardiovascular disease in post-menopausal women.

82.     These alleged proffered benefits of EVISTA were highlighted in materials provided to the Lilly sales representatives which stated "Vista's Three Combined Benefits." "EVISTA offers the best preventive therapy combination after menopause."

83.     The source of these assertions were incomplete and questionable clinical studies sponsored by Lilly.

84.     The expectation of Lilly's management was that by making these questionable representations to physicians, the doctors would be motivated to recommend that all of their post-menopausal patients take EVISTA not only for treatment of osteoporosis, whether properly diagnosed or not, but also as a preventive medication for breast cancer and cardiovascular disease.

## COUNT 1

## VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729

85.     Relators repeat and reallege paragraph 1-84 of this Third Amended Complaint.

15

86.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the United States Government by causing false or fraudulent claims to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(3).

87.    From at least May, 2001 to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to various state and federally funded Medicaid health care program false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(3).

88.    The United States, its fiscal intermediaries and state Medicaid programs, were unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicare, Medicaid and CHAMPUS reimbursement that they would not otherwise have paid.

89.    The United States and the State Medicaid Programs have been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in amount equal to three times the amount of damages that the United States has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less $5,000 nor more than $10,000 for each violation of 31 U.S.C. § 3729;

b.    that Relators, as *qui tam* plaintiffs, be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and/or any other applicable provision of law;

16

c.      that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs incurred in the prosecution of this suit; and

d.      that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT II

## RETALIATION IN VIOLATION OF 31 U.S.C. §3730(H)

## ROBERT RUDOLPH VS. ELI LILLY

90.     Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

91.     Relator Robert Rudolph is a pharmacist, licensed by the state of Oregon.

92.     Relator Robert Rudolph had been a longtime sales representative for Eli Lilly.

93.     In late November, 2001, Rudolph first learned of the Lilly sales conversion program diverting patients from other medications to pharmaceutical products manufactured and distributed by Eli Lilly as well as the transitioning of Prozac Daily patients to Prozac Weekly. See paragraphs 11 through 51. Rudolph immediately contacted Lilly's Corporate Compliance Officer to complain of the sales program.

94.     Despite agreeing that the sales program violated 19 of the Lilly good promotional practices guidelines, the Compliance Officer took no effective remedial action.

95.     In January, 2002, Rudolph attended a sales meeting where he challenged the use of the sales program as one which was dangerous to the health of patients who received prescriptions for the Lilly drugs absent adequate medical supervision. He also expressed concern about false inflation of Eli Lilly profits.

96.     In late spring, 2002, the District Sales Manager for Northern California, Southern Oregon and Nevada met with Bob Rudolph and advised that he was not a "team player" and "was out of line when he questioned the performance scripts and marketing program". Following this meeting, Rudolph was treated with disdain by Eli Lilly management.

17

97.     On or about June 30, 2002, Rudolph ended his employment with Eli Lilly. As a direct result of Defendant's harassment, Rudolph has suffered severe emotional distress and physical injury, including but not limited to clinical depression. At all times material hereto, the Defendant Eli Lilly was an employer covered by 31 U.S.C. §3730(h).

98.     Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act,  31 U.S.C. §3729.

99.     Rudolph's constructive discharge was in violation of 31 U.S.C. §3730(h).

100.     As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Rudolph has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Rudolph's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Rudolph resigned for reasons unrelated to the aforementioned threats and harassment.

101.     Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

WHEREFORE, Rudolph requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

18

## COUNT III

## RETALIATION IN VIOLATION OF 31 U.S.C. §3730(H)

## HECTOR ROSADO VS. ELI LILLY

102.    Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

103.    Hector Rosado had been a Lilly sales representative for thirty years.

104.    Hector Rosado became the subject of his Lilly supervisor's criticism when he refused to follow the new sales conversion program for Prozac Weekly.

105.    In early 2002, Mr. Rosado was told by his sales manager that due to his substandard performance that it would be necessary for him to learn the program where it was practiced best – in Modesto and Roseville, California.

106.    When Mr. Rosado resisted training in either Modesto or Roseville, he was ordered to participate in a sales indoctrination or "blitz" week during March of 2002 in Eugene, Oregon. He was to work with two sales managers, one of whom had no experience with his principal product, Zyprexa.

107.    After thirty years as a Lilly sales representative, Mr. Rosado was advised "that it was not going to work out", that he no longer related well to physicians.

108.    Mr. Rosado was told that the lunches and traditional educational programs that he did with physicians were no longer effective.

109.    Mr. Rosado complained to Human Resources at Eli Lilly and received no relief. He was told by Lilly's Human Resource person that if he went to a lawyer to seek redress, he would be considered to have threatened his district manager and thus, subject to disciplinary action.

110.    Mr. Rosado was forced to take three months of sick leave due to nervous anxiety and depression caused by the pressures imposed by Lilly Sales Management.

111.    Mr. Rosado retired from Eli Lilly in December, 2002.

19

112.     As a direct result of Defendant's harassment, Rosado has suffered severe emotional distress and physical injury, including but not limited to clinical depression. At all times materials hereto, the Defendant Eli Lilly was an employer covered by 31 U.S.C. §3730(h).

113.     Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act, 31 U.S.C. §3729.

114.     Rosado's constructive discharge was in violation of 31 U.S.C. §3730(h).

115.     As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Rosado has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Rosado's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Rosado resigned for reasons unrelated to the aforementioned threats and harassment.

116.     Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

WHEREFORE, Hector Rosado requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

20

## COUNT IV

## RETALIATION IN VIOLATION OF 31 U.S.C. §3730(H)

### BRADLEY LUTZ  VS. ELI LILLY

117.        Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

118.        Bradley Lutz is a pharmacist licensed by the state of Idaho.

119.        Mr. Lutz has been a longtime Eli Lilly sales representative.

120.        In October, 1997, Bradley Lutz was transferred from the Women's Health sales force to the Diabetes sales force.

121.        Sometime following his transfer, Mr. Lutz began to notice that his sales rankings relative to other sales people fluctuated from quarter to quarter with little explanation.

122.        He learned sometime thereafter that his sales performance suffered in comparison to other sales people based on the participation of others in the Humulin conversion program.

123.        The Lilly sales people in the Diabetes Division were incentivized to have their physician customers convert patients from their use of Humulin (a self-administered Insulin alternative) to the Humulin pen.

124.        Medicare's reimbursement for the Humulin pen was significantly more expensive than ordinary Humulin.

125.        Mr. Lutz learned that members of the Diabetes sales force were employing the sales tactics described in paragraphs 11 through 51 of this Complaint.  As a licensed pharmacist, he refused to engage in the same sales practices.

126.         In January, 2001, at a district sales meeting in Spokane, Washington, Lutz was taken aside by his regional sales manager and told that he would have to improve his sales performance or lose his job. He again refused to seek the conversion of patients to the Humulin pen without their knowledge.

127.         During the summer of 2002, some information became public regarding unethical sales practices at Lilly. In response, Lilly encouraged sales people to come forward with any information regarding unethical sales practices.

128.         On July 15, 2002, Bradley Lutz e-mailed the company hotline. He begged the Company to investigate what he described as the "illegal use of performance prescriptions". (A copy of Lutz' e-mail is attached hereto as Exhibit "F"). He received no response.

129.         Relator Lutz became increasingly ill and depressed over his performance ratings and inability to satisfy management.

130.         In October, 2002, Lutz went on sick leave.

131.         On February 18, 2003, Lutz again wrote management concerning his plight. While on sick leave, his sales territory was lost to a new sales representative.

132.    As part of Lilly's sick leave policy, Lutz was required to have regular physical examinations. Reports of those examinations were to be sent to Lilly.

133.    On or about March 4, 2003, Mr. Lutz' psychiatrist, Dr. Leslie Lundt, reports that his patient continued to suffer from major depression and that he was unable to work in any capacity. The doctor estimated Mr. Lutz' "return to work date" to be June 1, 2003.

134.    On May 15, 2003, Mr. Lutz was advised that he had not provided appropriate documentation to support his request for continued medical-related leave of absence. He was declared ineligible retrospectively to April 5, 2003.

135.    On May 16, 2003, Mr. Lutz resigned from Lilly following twenty-seven years with the company.

136.   Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act, 31 U.S.C. §3729.

137.   Lutz's constructive discharge was in violation of 31 U.S.C. §3730(h).

138.   As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Lutz has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Lutz's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Lutz resigned for reasons unrelated to the aforementioned threats and harassment.

139.   Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

WHEREFORE, Lutz requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.


## COUNT V

## RETALIATION IN VIOLATION OF 31 U.S.C. §3730(H)

## JAMES WETTA VS. ELI LILLY

140.   Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

141.    In October, 2001, Relator James Wetta was advised by his sales manager that his sales performance was not meeting company expectations.

142.    At the same meeting, he was informed of the sales tactics set forth in paragraphs 11 through 51 of this Complaint as what needed to be done in order for him to retain his job.

143.    Wetta complained to his sales manager that he thought it illegal and medically dangerous to switch patients from Prozac Daily to Prozac Weekly without their knowledge.

144.    Wetta's sales manager advised him that he must improve his sales performance within the next year.

145.    Following the meeting with his sales manager and Wetta's stated resistance to following the "conversion program" he was advised that he would have to improve his sales performance within 3 months to keep his job at Lilly.

146.    At the time that Wetta was warned to increase his sales performance, he was meeting all other customer service performance standards.

147.    On or about February 1, 2002, Wetta resigned from Eli Lilly.  As a direct result of Defendant's harassment, Wetta has suffered severe emotional distress.  At all times materials hereto, the Defendant Eli Lilly was an employer covered by 31 U.S.C. §3730(h).

148.    Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act,  31 U.S.C. §3729.

149.    Wetta's constructive discharge was in violation of 31 U.S.C. §3730(h).

24

150.   As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Wetta has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Wetta's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Wetta resigned for reasons unrelated to the aforementioned threats and harassment.

151.   Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

WHEREFORE, Wetta requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

## COUNT VI

## RETALIATION  IN VIOLATION OF 31 U.S.C. §3730(H)

### ROBERT EVAN DAYWITT VS. ELI LILLY

152.   Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

153.   Relator Robert Evan Daywitt was employed by Eli Lilly from November 13, 1997 to December 12, 2002 when he was discharged for purported "misconduct".

154.   In the two years prior to his termination, Daywitt had received positive reviews from his manager and had been told that he would be promoted to corporate headquarters

25

as an "Associate". In each of those two years, he had ranked second and third, respectively, among the sales persons in his district.

155. In January, 2001, Daywitt attended a sales meeting wherein he was outspoken in the challenge to the use of the sales program as one which was dangerous to the health of patients who received prescriptions for the Lilly drugs absent adequate medical supervision. He also express concern about an inflation of Eli Lilly profits.

156. In late spring, 2001, the District Sales Manager for Northern California, Southern Oregon and Nevada met with Evan Daywitt and advised that he was not a "team player" and "was out of line when he questioned the performance scripts and marketing program". Following this meeting, Daywitt was treated with disdain by Eli Lilly management.

157. On or about June 14, 2001, Daywitt's sales manager admonished him in writing to implement the Prozac Weekly conversion program in three offices.

158. In October, 2001, Daywitt's new sales manager had each of the district's sales people participate in a conference call which described the sales conversion program for Prozac Weekly.

159. After discussing his doubts as to the legality of the program with Relator Robert Rudolph, Daywitt sent a hard copy description of the program to Lilly's Corporate Compliance Office.

160. Immediately following the Compliance Officer's receipt of the hard copy description, Daywitt's sales manager was admonished for promoting the conversion program.

161. Concurrent with receiving the criticism from the Compliance Officer, Daywitt's sales manager began to harass him concerning his sales performance.

162. Daywitt lodged a formal complaint about the sales manager's harassment with Lilly's Human Resource office. Despite the complaint, the harassment continued.

26

163.   On or about December 12, 2002, Daywitt was terminated by Eli Lilly. As a direct result of Defendant's harassment, Daywitt has suffered severe emotional distress and physical injury, including but not limited to clinical depression. At all times materials hereto, the Defendant Eli Lilly was an employer covered by 31 U.S.C. §3730(h).

164.   Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act,  31 U.S.C. §3729.

165.   Daywitt's constructive discharge was in violation of 31 U.S.C. §3730(h).

166.   As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Daywitt has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Daywitt's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Daywitt resigned for reasons unrelated to the aforementioned threats and harassment.

167.   Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

WHEREFORE, Daywitt requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

27

## COUNT VII

## RETALIATION IN VIOLATION OF 31 U.S.C. §3730(H)

## WILLIAM LOFING VS. ELI LILLY

168.   Plaintiff repeats and realleges paragraphs 1-89 of this Third Amended Complaint.

169.   William Lofing is a former sales representative for Eli Lilly.

170.   William Lofing became the subject of his Lilly supervisors' criticism and unwarranted disciplinary action beginning in 2002 culminating in his constructive discharge in October, 2004.

171.   Sometime beginning around late 2002, Mr. Lofing informed his manager of his feeling that he felt it was a misleading sales practice to encourage primary care physicians to prescribe Zyprexa based on symptoms instead of for the specific disease indications for which it had been approved by the FDA.

172.   Mr. Lofing consulted with a nurse regarding the practice of selling Zyprexa to primary care physicians for prescription based on symptoms rather than disease indications, as was Lilly's sales and marketing practice. The nurse confirmed Mr. Lofing's position that such marketing and sales tactics were inappropriate and potentially dangerous.

173.   Mr. Lofing reported this information to his district manager, but was told "not to worry about it", and to continue to employ the sales and marketing practices required by Lilly management in the promotion of Zyprexa to primary care physicians.

174.   Immediately following Mr. Lofing's expressions of concern about such practices to his superiors, Mr. Lofing's field reviews were downgraded from very good to poor.

175.   The reasons stated in the reviews for the poor marks were extremely vague and merely referenced Mr. Lofing's failure to follow the recommended sales and marketing tactics.

28

176.    As result of Mr. Lofing's refusal to comply with Lilly's inappropriate marketing practices, he was issued a verbal warning followed by a written warning.

177.    Mr. Lofing was also given a number of out of work assignments which were supposedly assigned to help him "improve" his reviews. Despite his diligent work on these superfluous assignments, his evaluations did not improve.

178.    During this time Mr. Lofing was harassed by with suggestions that he might prefer working some place else.

179.    Finally, in October, 2004, after being told he was being placed on probation for a six month period, Mr. Lofing resigned from employment at Eli Lilly.

180.    As a direct result of Defendant's harassment, Mr. Lofing has suffered severe emotional distress. At all times material hereto, the Defendant, Eli Lilly, was an employer covered by 31 U.S.C. §3730(h).

181.    Section 3720(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the False Claims Act, 31 U.S.C. §3729.

182.    Mr. Lofing's constructive discharge was in violation of 31 U.S.C. §3730(h).

183.    As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Lofing has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Lofing's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Lofing resigned for reasons unrelated to the aforementioned threats and harassment.

184.    Defendant's conduct was malicious. Fraudulent and oppressive and in violation of public policy and in violation of 31 U.S.C. §3730(h).

29

WHEREFORE, William Lofing requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to: (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

## COUNT VIII

## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT, CAL. GOV. CODE §12651

185.   Relators repeat and reallege paragraphs 1-184 of this Third Amended Complaint.

186.   From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the State of California by causing false or fraudulent claims to be paid or approved by the State of California in violation of CAL. GOV. CODE § 12651(a)(3).

187.   From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to California's state funded Medicaid health care program false or fraudulent claims for payment in violation of CAL. GOV. CODE § 12651(a)(3).

188.   California's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

189.   The California State Medicaid Program has been damaged by the payment of false and fraudulent claims.

30

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the California False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in amount equal to not less than two times and not more than three times the amount of damages that California has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not more than $10,000 for each violation of CAL. GOV. CODE § 12651(a)(3);

b.    that Relators, as *qui tam* plaintiffs, be awarded the maximum amount allowed pursuant to CAL. GOV. CODE § 12652(g)(2) and/or any other applicable provision of law;

c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

### COUNT IX

### RETALIATION IN VIOLATION OF CAL GOV CODE §12653(B)

### JAMES WETTA VS. ELI LILLY

190.    Relators repeat and reallege paragraphs 1-89 of this Third Amended Complaint.

191.    In October 2001, Relator James Wetta was informed by his sales manger that his sales performance was not meeting company expectations.

192.    Wetta was also informed at this meeting of the sales tactics set forth in paragraphs 11-51 of this Amended Complaint as what needed to be done in order for Wetta to retain his job.

193.    Wetta complained to his sales manager that he thought it illegal and medically dangerous to switch patients from Prozac Daily to Prozac Weekly with out their knowledge.

31

194.    Wetta's sales manager advised him that he must improve his sales performance within the next year.

195.    Following the meeting with his sales manager and Wetta's stated resistance to following the "conversion program" he was advised that he would have to improve his sales quota 52% in order to keep his job at Lilly.

196.    At the time that Wetta was warned to increase his quota 52%, he was meeting all other customer service performance standards.

197.    On or about February 1, 2002, Wetta resigned from Eli Lilly.  As a direct result of Defendant's harassment, Wetta has suffered severe emotional distress.  At all times materials hereto, the Defendant Eli Lilly was an employer covered by CAL. GOV. CODE § 12653.

198.    Section 12653(b) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the California False Claims Act,  CAL. GOV. CODE § 12652.

199.    Wetta's constructive discharge was in violation of CAL. GOV. CODE § 12653(b).

200.    As a direct and proximate result of the retaliation, harassment, threats and constructive discharge by the Defendants, Wetta has suffered and incurred and is suffering and incurring substantial loss of past and future earnings, compensation and other benefits and monies; harm and damage to Wetta's professional reputation and credibility by being constructive and wrongfully discharged in violation of public policy with the false implication and statements of employees, perspective employers and others in the community that Wetta resigned for reasons unrelated to the aforementioned threats and harassment.

201.    Defendant's conduct was malicious, fraudulent and oppressive and in violation of public policy and in violation of CAL. GOV. CODE § 12653(b).

WHEREFORE, Wetta requests that judgment be entered against Defendant in his favor and that he be awarded any and all relief pursuant to Cal Gov Code § 12653(c) including, but not

limited to:  (a) Two times the amount of back pay; (b) Interest on back pay; (c) Any and all other compensatory and special damages; (d) All litigation costs and reasonable attorney's fees; (e) Punitive damages; and (f) Any and such further relief that this Court deems appropriate.

## COUNT X

## VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. TIT. 6 §1201

202.    Relators repeat and reallege paragraphs 1-201 of this Third Amended Complaint.

203.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Delaware by causing false or fraudulent claims to be paid or approved by the state of Delaware in violation of DEL. CODE ANN. TIT. 6, §1201(a)(3).

204.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Delaware's state funded Medicaid health care program false or fraudulent claims for payment in violation of DEL. CODE ANN. TIT. 6, §1201(a)(3).

205.    Delaware's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

206.    The Delaware State Medicaid Program has been damaged by the payment of false and fraudulent claims.

33

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.     that by reason of the aforementioned violations of the Delaware False Claims and Reporting Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that Delaware has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of DEL. CODE ANN. TIT. 6, §1201(a)(3);

b.     that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to DEL. CODE ANN. tit. 6, §1205(a) and/or any other applicable provision of law;

c.     that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.     that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XI

## VIOLATION OF D.C. CODE ANN. §§2-308.13–.15

207.   Relators repeat and reallege paragraphs 1-206 of this Third Amended Complaint.

208.   From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the District of Columbia by causing false or fraudulent claims to be paid or approved by the District of Columbia in violation of D.C. CODE ANN. §2-308.14(a)(3).

209.   From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to the

34

District of Columbia's state funded Medicaid health care program false or fraudulent claims for payment in violation of D.C. CODE ANN. §2-308.14(a)(3).

210.   The District of Columbia's Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

211.   The District of Columbia Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.      that by reason of the aforementioned violations of the District of Columbia's false claim provisions that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that the District of Columbia has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of D.C. CODE ANN. §2-308.14(a)(3);

b.      that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to D.C. CODE ANN. §2-308.15(f)(1) and/or any other applicable provision of law;

c.      that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.      that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

35

## COUNT XII

## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT, FLA. STAT. ANN. §68.081-.090

212.     Relators repeat and reallege paragraphs 1-211 of this Third Amended Complaint.

213.     From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Florida by causing false or fraudulent claims to be paid or approved by the state of Florida in violation of FLA. STAT. ANN. §68.082(2)(a)(3).

214.     From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Florida's state funded Medicaid health care program false or fraudulent claims for payment in violation of FLA. STAT. ANN. §68.082(2)(a)(3).

215.     Florida's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

216.     The Florida State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.     that by reason of the aforementioned violations of the Florida False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that the state of Florida has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil

36

penalty of not less than $5,000 and not more than $10,000 for each violation of FLA. STAT. ANN. §68.082(2)(a)(3);

   b.  that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to FLA. STAT. ANN. §68.085(1)-(2) and/or any other applicable provision of law;

   c.  that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

   d.  that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XIII

## VIOLATION OF HAW. REV. STAT. §§661-21 to 661-29

217. Relators repeat and reallege paragraphs 1-216 of this Third Amended Complaint.

218. From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Hawaii by causing false or fraudulent claims to be paid or approved by the state of Hawaii in violation of HAW. REV. STAT. §661-21(a)(3).

219. From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Hawaii's state funded Medicaid health care program false or fraudulent claims for payment in violation of HAW. REV. STAT. §661-21(a)(3).

37

220.   Hawaii's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

221.   The Hawaii State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.   that by reason of the aforementioned violations of Hawaii's false claim provisions that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that the state of Hawaii has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of HAW. REV. STAT. §661-21(a)(3);

b.   that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to HAW. REV. STAT. §661-27(a) and/or any other applicable provision of law;

c.   that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.   that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XIV

## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT, 740 ILL. COMP. STAT. 175/1-8

222.    Relators repeat and reallege paragraphs 1-221 of this Third Amended Complaint.

223.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Illinois by causing false or fraudulent claims to be paid or approved by the state of Illinois in violation of 740 ILL. COMP. STAT. 175/ 3(a)(3).

224.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Illinois' state funded Medicaid health care program false or fraudulent claims for payment in violation of 740 ILL. COMP. STAT. 175/ 3(a)(3).

225.    Illinois' State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

226.    The Illinois State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.      that by reason of the aforementioned violations of the Illinois

Whistleblower Reward and Protection Act that this Court enter judgment in Plaintiffs' favor and

against Eli Lilly in an amount equal to three times the amount of damages that the state of

Illinois has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty

of not less than $5,000 and not more than $10,000 for each violation of 740 ILL. COMP. STAT.

175/ 3(a)(3;

b.      that Relators, as qui tam plaintiffs, be awarded the maximum amount

allowed pursuant to 740 ILL. COMP. STAT. 175/ 4(d)(1) and/or any other applicable provision

of law;

c.      that Relators be awarded all costs and expenses of this action, including

attorney's fees and court costs in the prosecution of this suit; and

d.      that Plaintiffs and Relators have such other and further relief that this

Court deems just and proper.

### COUNT XV

### VIOLATION OF MASS. GEN. LAWS, CH. 12, §5A-5O

227.    Relators repeat and reallege paragraphs 1-226 of this Third Amended Complaint.

228.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard

or deliberate ignorance of the truth or falsity of the information involved conspired with

physicians and pharmacies to defraud the Commonwealth of Massachusetts by causing

false or fraudulent claims to be paid or approved by the Commonwealth of Massachusetts

in violation of MASS. GEN. LAWS. CH. 12, §5B(3).

229.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate

ignorance of the truth or falsity of the information involved conspired with doctors and

pharmacies to cause to be presented and are still presenting or causing to present to

Massachusetts' state funded Medicaid health care program false or fraudulent claims for

payment in violation of MASS. GEN. LAWS. CH. 12, §5B(3).

40

230.   Massachusetts' Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

231.   The Massachusetts Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.   that by reason of the aforementioned violations of Massachusetts' false claim provisions that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to three times the amount of damages, including consequential damages, that the Commonwealth of Massachusetts has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of MASS. GEN. LAWS. CH. 12, §5B(3);

b.   that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to MASS. GEN. LAWS. CH. 12, §5F(1)-(3) and/or any other applicable provision of law;

c.   that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.   that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XVI

## VIOLATION OF NEV. REV. STAT. § 357.010–.250

232.   Relators repeat and reallege paragraphs 1-231 of this Third Amended Complaint.

233.   From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Nevada by causing false or fraudulent claims to be paid or approved by the state of Nevada in violation of NEV. REV. STAT. § 357.014(1)(c).

234.   From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Nevada's state funded Medicaid health care program false or fraudulent claims for payment in violation of NEV. REV. STAT. § 357.014(1)(c)).

235.   Nevada's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

236.   The Nevada State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.   that by reason of the aforementioned violations of Nevada's false claim provisions that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to three times the amount of damages that the state of Nevada has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of NEV. REV. STAT. § 357.014(1)(c);

b.   that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to NEV. REV. STAT. § 357.210(1) and/or any other applicable provision of law;

c.   that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

42

d.      that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

### COUNT XVII

### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT, TENN. CODE ANN. §§71-5-181 TO -185

237.    Relators repeat and reallege paragraphs 1-236 of this Third Amended Complaint.

238.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Tennessee by causing false or fraudulent claims to be paid or approved by the state of Tennessee in violation of TENN. CODE ANN. §71-5-182(a)(1)(C).

239.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Tennessee's state funded Medicaid health care program false or fraudulent claims for payment in violation of TENN. CODE ANN. §71-5-182(a)(1)(C).

240.    Tennessee's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

241.    The Tennessee State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

43

a.     that by reason of the aforementioned violations of the Tennessee Medicaid False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that the state of Tennessee has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of TENN. CODE ANN. §71-5-182(a)(1)(C);

b.     that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to TENN. CODE ANN. §71-5-183(c)(1) and/or any other applicable provision of law;

c.     that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.     that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XVIII

## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION STATUTE, TEX. HUM. RES. CODE ANN. §§ 36.001-.132

242.     Relators repeat and reallege paragraphs 1-241 of this Third Amended Complaint.

243.     From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Texas by causing false or fraudulent claims to be paid or approved by the state of Texas in violation of TEX. HUM. RES. CODE ANN. §36.002(8).

44

244.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Texas' state funded Medicaid health care program false or fraudulent claims for payment in violation of TEX. HUM. RES. CODE ANN. §36.002(8).

245.    Texas' State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

246.    The Texas State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

    a.    that by reason of the aforementioned violations of the Texas Medicaid Fraud Prevention Statute that this Court enter judgment in Plaintiffs' favor and against Eli in an amount equal to two times the amount of damages that the state of Texas has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $15,000 for each violation of TEX. HUM. RES. CODE ANN. §36.002(8) that results in injury to an elderly person, a disabled person, or a person younger than 18 years of age, or not less than $1,000 and not more than $10,000 for each violation of TEX. HUM. RES. CODE ANN. §36.002(8) that does not result in injury to a person;

    b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to TEX. HUM. RES. CODE ANN. §36.110 and/or any other applicable provision of law;

    c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

    d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

45

## COUNT XIX

## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT, VA. CODE ANN. §§ 8.01-216.1 – 216.19

247.    Relators repeat and reallege paragraphs 1-246 of this Third Amended Complaint.

248.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the Commonwealth of Virginia by causing false or fraudulent claims to be paid or approved by the Commonwealth of Virginia in violation of VA. CODE ANN. § 8.01-216.3(A)(3).

249.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Virginia's state funded Medicaid health care program false or fraudulent claims for payment in violation of VA. CODE ANN. § 8.01-216.3(A)(3).

250.    Virginia's Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

251.    The Virginia Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

DM1\1335314.2

    a.    that by reason of the aforementioned violations of the Virginia Fraud Against Taxpayers Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that the Commonwealth of Virginia has sustained because of Eli Lilly's and its co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of VA. CODE ANN. §§ 8.01-216.3(A)(3);

    b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to VA. CODE ANN. § 8.01-216.7(A) and/or any other applicable provision of law;

    c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

    d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XX

## VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT, GA. CODE ANN. § 49-4-168 – 49-4-168.6

252.    Relators repeat and reallege paragraphs 1-251 of this Third Amended Complaint.

253.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Georgia by causing false or fraudulent claims to be paid or approved by the state of Georgia in violation of GA. CODE ANN. § 49-4-168.1.

47

254. From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Georgia's state funded Medicaid health care program false or fraudulent claims for payment in violation of GA. CODE ANN. § 49-4-168.1.

255. Georgia's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

256. The Georgia State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a. that by reason of the aforementioned violations of the Georgia False Medicaid Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that Georgia has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of GA. CODE ANN. § 49-4-168.1;

b. that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to GA. CODE ANN. § 49-4-168.2(i) and/or any other applicable provision of law;

c. that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d. that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXI

## VIOLATION OF THE INDIANA STATE FALSE CLAIMS AND WHISTLEBLOWERS PROTECTION ACT, IND. CODE ANN. § 5-11-5.5-1 - 5-11-5.5-18

257.    Relators repeat and reallege paragraphs 1-256 of this Third Amended Complaint.

258.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Indiana by causing false or fraudulent claims to be paid or approved by the state of Indiana in violation of IND. CODE ANN. § 5-11-5.5-2.

259.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Indiana's state funded Medicaid health care program false or fraudulent claims for payment in violation of IND. CODE ANN. § 5-11-5.5-2.

260.    Indiana's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

261.    The Indiana State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

    a.      that by reason of the aforementioned violations of the Indiana State False Claims and Whistleblower Protection Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the

49

amount of damages that Indiana has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 each violation of IND. CODE ANN. § 5-11-5.5-2;

      b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to IND. CODE ANN. § 5-11-5.5-6 and/or any other applicable provision of law;

      c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

      d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXII

## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT, MICH. COMP LAWS § 400.601- 400.613

262.    Relators repeat and reallege paragraphs 1-261 of this Third Amended Complaint.

263.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Michigan by causing false or fraudulent claims to be paid or approved by the state of Michigan in violation of MICH. COMP LAWS § 400.603, 606 and 607.

264.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Michigan's state funded Medicaid health care program false or fraudulent claims for payment in violation of MICH. COMP LAWS § 400.603, 606 and 607.

265.    Michigan's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

266.    The Michigan State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the Michigan State Medicaid False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to three times the amount of damages that Michigan has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty equal to the full amount Eli Lilly unjustly received as a result of its unlawful conduct for violating MICH. COMP LAWS § 400.603, 606 and 607;

b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to MICH. COMP LAWS § 400.610a and/or any other applicable provision of law;

c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

51

## COUNT XXIII

## VIOLATION OF THE MONTANA FALSE CLAIMS ACT,  MONT. CODE ANN. § 17-8-401 – 17-8-412

267.    Relators repeat and reallege paragraphs 1-266 of this Third Amended Complaint.

268.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Montana by causing false or fraudulent claims to be paid or approved by the state of Montana in violation of MONT. CODE ANN. § 17-8-403.

269.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Montana's state funded Medicaid health care program false or fraudulent claims for payment in violation of MONT. CODE ANN. § 17-8-403.

270.    Montana's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

271.    The Montana State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the Montana False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that

52

Montana has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not more than $10,000 for each violation of MONT. CODE ANN. § 17-8-403.

      b.     that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to MONT. CODE ANN. § 17-8-410 and/or any other applicable provision of law;

      c.     that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

      d.     that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXIV

## VIOLATION OF THE NEW HAMPSHIRE FRAUD AND FALSE CLAIMS ACT, N.H. REV. STAT. ANN. § 167:58 - 167:61-b

272.    Relators repeat and reallege paragraphs 1-271 of this Third Amended Complaint.

273.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of New Hampshire by causing false or fraudulent claims to be paid or approved by the state of New Hampshire in violation of N.H. REV. STAT. ANN. § 167:61-b.

274.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to New Hampshire's state funded Medicaid health care program false or fraudulent claims for payment in violation of N.H. REV. STAT. ANN. § 167:61-b.

53

275.    New Hampshire's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

276.    The New Hampshire State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the New Hampshire Fraud and False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that New Hampshire has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of N.H. REV. STAT. ANN. § 167:61-b.

b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to N.H. REV. STAT. ANN. § 167:61-e and/or any other applicable provision of law;

c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

### COUNT XXV

### VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN. § 27-14-1 – 27-14-15

277.    Relators repeat and reallege paragraphs 1-276 of this Third Amended Complaint.

278.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of New Mexico by causing false or fraudulent claims to be paid or approved by the state of New Mexico in violation of N.M. STAT. ANN. § 27-14-4.

279.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to New Mexico's state funded Medicaid health care program false or fraudulent claims for payment in violation of N.M. STAT. ANN. § 27-14-4.

280.    New Mexico's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

281.    The New Mexico State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

        a.    that by reason of the aforementioned violations of the New Mexico Medicaid False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to three times the amount of damages that New Mexico has sustained because of Eli Lilly's and the co-conspirators' actions for violation of N.M. STAT. ANN. § 27-14-4.

        b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to N.M. STAT. ANN. § 27-14-9 and/or any other applicable provision of law;

55

c.      that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.      that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXV

## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT, N.Y. STATE FIN. LAW § 187-194

282.    Relators repeat and reallege paragraphs 1-281 of this Third Amended Complaint.

283.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of New York by causing false or fraudulent claims to be paid or approved by the state of New York in violation of N.Y. STATE FIN. LAW § 189.

284.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to New York's state funded Medicaid health care program false or fraudulent claims for payment in violation of N.Y. STATE FIN. LAW § 189.

285.    New York's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

286.    The New York State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.    that by reason of the aforementioned violations of the New York False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that New York has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of for violation of N.Y. STATE FIN. LAW § 189.

b.    that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to N.Y. STATE FIN. LAW § 190(6) and/or any other applicable provision of law;

c.    that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.    that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXVI

## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT N.J. STAT. § 2A:32C-1 -17

287.    Relators repeat and reallege paragraphs 1-286 of this Third Amended Complaint.

288.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of New Jersey by causing false or fraudulent claims to be paid or approved by the state of New Jersey in violation of N.J. STAT. § 2A:32C-3.

289. From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to New Jersey's state funded Medicaid health care program false or fraudulent claims for payment in violation of N.J. STAT. § 2A:32C-3.

290. New Jersey's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

291. The New Jersey State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a. that by reason of the aforementioned violations of the New Jersey False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to not less than two times and not more than three times the amount of damages that New Jersey has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000 for each violation of N.J. STAT. § 2A:32C-3.

b. that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to N.J. STAT. § 2A:32C-7 and/or any other applicable provision of law;

c. that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d. that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

58

## COUNT XXVII

## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT 63 OKL. ST. §
## 5053-5053.7

292.    Relators repeat and reallege paragraphs 1-291 of this Third Amended Complaint.

293.    From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Oklahoma by causing false or fraudulent claims to be paid or approved by the state of Oklahoma in violation of 63 Okl. St. § 5053.1.

294.    From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Oklahoma's state funded Medicaid health care program false or fraudulent claims for payment in violation of 63 Okl. St. § 5053.1.

295.    Oklahoma's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

296.    The Oklahoma State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.      that by reason of the aforementioned violations of the Oklahoma Medicaid False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in 'an amount equal to three times the amount of damages that Oklahoma has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, if not already imposed by the Federal False Claims Act for the same or prior action, for each violation of for violation of 63 Okl. St. § 5053.1.

b.      that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to 63 Okl. St. § 5053.1.4 and/or any other applicable provision of law;

c.      that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.      that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

## COUNT XXVIII

## VIOLATION OF RHODE ISLAND'S STATE FALSE CLAIMS ACT R.I. GEN. LAWS § 9-1.1-1 – 9-1.1-8

297.   Relators repeat and reallege paragraphs 1-296 of this Third Amended Complaint.

298.   From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Rhode Island by causing false or fraudulent claims to be paid or approved by the state of Rhode Island in violation of R.I. Gen. Laws § 9-1.1-3.

60

299.   From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present to Rhode Island's state funded Medicaid health care program false or fraudulent claims for payment in violation of R.I. Gen. Laws § 9-1.1-3.

300.   Rhode Island's State Medicaid Program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay Medicaid reimbursement that they would not otherwise have paid.

301.   The Rhode Island State Medicaid Program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.   that by reason of the aforementioned violations of Rhode Island's State False Claims Act that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount equal to three times the amount of damages that Rhode Island has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, for each violation of for violation of R.I. Gen. Laws § 9-1.1-3.

b.   that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to R.I. Gen. Laws § 9-1.1-4(d) and/or any other applicable provision of law;

c.   that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.   that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

61

## COUNT XXIX

## VIOLATION OF WIS. STAT. § 20.931 FOR FALSE CLAIMS FOR MEDICAL ASSISTANCE

302.   Relators repeat and reallege paragraphs 1-301 of this Third Amended Complaint.

303.   From at least May, 2001 continuing to the present, Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with physicians and pharmacies to defraud the state of Wisconsin by causing false or fraudulent claims to be paid or approved by the state of Wisconsin in violation of Wis. Stat. § 20.931.

304.   From at least May, 2001 to the present Eli Lilly in reckless disregard or deliberate ignorance of the truth or falsity of the information involved conspired with doctors and pharmacies to cause to be presented and are still presenting or causing to present Wisconsin's state funded medical assistance program false or fraudulent claims for payment in violation of Wis. Stat. § 20.931.

305.   Wisconsin's state medical assistance program was unaware of Eli Lilly's conspiracies or the falsity of the records, statements and claims made by Eli Lilly's co-conspirators and as a result thereby have paid and continue to pay medical reimbursement that they would not otherwise have paid.

306.   The Wisconsin medical assistance program has been damaged by the payment of false and fraudulent claims.

WHEREFORE, Plaintiffs demand judgment against Eli Lilly as follows:

a.     that by reason of the aforementioned violations of Wis. Stat. § 20.931 for False Claims for Medical Assistance  that this Court enter judgment in Plaintiffs' favor and against Eli Lilly in an amount not less than two times and not more than three times the amount of damages that Wisconsin has sustained because of Eli Lilly's and the co-conspirators' actions, plus a civil penalty of not less than $5,000 and not more than $10,000, for each violation of for violation of Wis. Stat. § 20.931.

b.     that Relators, as qui tam plaintiffs, be awarded the maximum amount allowed pursuant to and/or any other applicable provision of law;

c.     that Relators be awarded all costs and expenses of this action, including attorney's fees and court costs in the prosecution of this suit; and

d.     that Plaintiffs and Relators have such other and further relief that this Court deems just and proper.

Respectfully submitted,

DUANE MORRIS LLP
Michael M. Mustokoff
(Atty. I.D. No. 15674)
Amanda M. Leadbetter
(Atty. I.D. No. 91728)
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1000

SHELLER, P.C.
Stephen A. Sheller
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

FREEDLAND, FARMER,
  RUSSO, BEHREN & SHELLER, PL
Gary M. Farmer, Jr.
7251 West Palmetto Park Road
Suite 206
Boca Raton, FL  33343
(561) 426-4848

Dated: 8/6/08

Attorneys for Plaintiffs

DM1\1335314.2